UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR A SEARCH WARRANT AUTHORIZING THE SEARCH OF ONE GREY IPHONE 13 PRO MAX IN A CLEAR PINK CASE SEIZED ON AUGUST 5, 2024<br><br>IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR A SEARCH WARRANT AUTHORIZING THE SEARCH OF ONE WHITE IPHONE 8 SEIZED ON AUGUST 5, 2024 | M.J. Nos. 24-6890-MPK<br>24-6891-MPK |

### AFFIDAVIT IN SUPPORT OF APPLICATIONS

I, Special Agent Ryan P. Glynn, being duly sworn, depose and state as follows:

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 2015. I currently am assigned to the Financial Investigations Team of the New England Field Division in Boston, Massachusetts, where I have been assigned since April 2021.

3. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, debriefings of defendants, informants and

witnesses who had personal knowledge regarding major narcotics trafficking organizations, and the court-authorized interception of communications. I have also reviewed taped conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

6. I submit this affidavit in support of Applications for Search Warrants authorizing agents to search the following cellular telephones, which were seized on August 5, 2024, from Yermis GARCIA AGUIAR:

    a. A grey iPhone 13 Pro Max in a clear pink case, as described in Attachment A-1 hereto (hereinafter, "Subject Telephone #1"); and

    b. A white iPhone 8, as described in Attachment A-2 hereto (hereinafter, "Subject Telephone #2").

Subject Telephone #1 and Subject Telephone #2 are referred to collectively herein as the "Subject Telephones."

7. The Subject Telephones currently are in the custody of DEA at 15 New Sudbury Street, Boston, Massachusetts 02203. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the Subject Telephones have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Telephones first came into investigators' possession.

8. As set forth below, there is probable cause to believe that the Subject Telephones contain evidence, fruits, and instrumentalities of violations of federal law, including distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit narcotics trafficking offenses, in violation of Title 21, United States Code, Section 846 (the "Target Offenses").

9. As part of my duties, I am participating in an investigation into the criminal activity of Santiago CANDELARIO-Alavarez ("CANDELARIO"), Manuel PINA MENDEZ, Yermis GARCIA AGUIAR, Victor BERROA MERCEDES, and others. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies. I have also reviewed information from a variety of additional sources, including telephone records, responses to administrative subpoenas, and undercover pickups of drug proceeds. Since the Affidavit is being submitted for the limited purpose of securing the requested Search Warrants, I have not included each and every fact known to me concerning this

investigation. I have set forth only the facts that I believe are necessary to establish the requisite probable cause.

## SUMMARY OF THE INVESTIGATION

10. Between July 2023 and February 2024, agents with the DEA conducted a series of money pickups from CANDELARIO and BERROA MERCEDES in connection with investigations into large-scale money laundering organizations. In total, CANDELARIO and BERROA MERCEDES delivered $358,800 in bulk cash drug proceeds to undercover law enforcement officers for laundering. The money pickups were arranged via cellular telephone. The funds were laundered in accordance with instructions provided by money brokers who provided contracts for the pickups of the funds.

11. On February 9, 2024, the Massachusetts State Police stopped CANDELARIO while he was en route to deliver $250,000 in bulk cash drug proceeds to an undercover law enforcement officer for laundering. The money was seized from CANDELARIO's vehicle. Thereafter, agents with the DEA obtained a search warrant for 21 Forest Acres Drive, Apartment A, Haverhill, Massachusetts. Agents had observed CANDELARIO, PINA MENDEZ, BERROA MERCEDES, and GARCIA AGUIAR outside of 21 Forest Acres Drive. Agents executed the warrant that day.

12. Upon entering the apartment, agents located George Alexis Lopez-Mendez ("Lopez") in the main bedroom. Lopez stated that his brother lived in the apartment, and that he (Lopez) was staying with his brother for a short period of time. Lopez stated that the main bedroom of the apartment was his brother's bedroom. In the main bedroom, agents located photographs of PINA MENDEZ and documents in the name Juan Manuel Pena Baez, which was

the name that PINA MENDEZ had provided to agents earlier that day.  Agents also seized three cellular telephones from the nightstand in the main bedroom.

13. The cellular telephones were searched pursuant to a search warrant.  On one of the telephones, agents located photographs of kilograms of drugs; pills that appear to be counterfeit oxycodone pills containing fentanyl; large sums of currency; a money counter; and a photograph of CANDELARIO's driver's license.  The phone was called "Many Mendez's iPhone."

14. In addition, during the search of 21 Forest Acres Drive, Apartment A, agents located a cardboard box in the bathroom vanity containing twenty brick-shaped packages wrapped in clear cellophane and black electrical tape.  Those that were wrapped in clear cellophane showed that the contents were packed white powder, and some of the bricks were stamped with "black mustang," "Jaguar," and "H."  Based on my training and experience, I am familiar with such bricks as kilograms of drugs packaged for sale.  The contents of nine of these packages were tested at the DEA Northeast Laboratory.  Each was found to contain cocaine and to weigh approximately one kilogram.

15. In an upper kitchen cabinet of Apartment A, agents located a cookie tin that contained one broken brick-shaped package containing packed white powder wrapped in a clear heat-sealed bag and stamped with a "Louis Vuitton" marking; one brick-shaped package containing packed white powder wrapped in a clear heat-sealed bag further wrapped in green cellophane and yellow electrical tape; one clear heat-sealed bag containing a hard packed brown powder; and two clear Ziploc baggies containing loose white powder and one heat-sealed bag containing loose white powder.  The white powder stamped with a Louis Vuitton marking tested positive at the DEA Northeast Laboratory for fentanyl and weighed 738 grams.  The brick

wrapped in green cellophane and yellow electrical tape tested positive at the DEA Northeast Laboratory for cocaine and weighed 902 grams. The packed brown powder tested positive at the DEA Northeast Laboratory for p-Fluorofentanyl (a fentanyl analogue), heroin, and cocaine, and weighed 228 grams. One of the bags of white powder tested positive at the DEA Northeast Laboratory for fentanyl and acetyl fentanyl and weighed 32 grams. Agents also located a suspected drug ledger on the kitchen table.

16.     In the second bedroom of the apartment, agents located a Domens money counter in a drawer under the bed, a Panapo vacuum sealer and a FoodSaver Heat Sealer in a black trash bag in the closet, passports for CANDELARIO and for GARCIA AGUIAR, photographs of CANDELARIO, paperwork in CANDELARIO's name, and baggage belonging to CANDELARIO.

17.     On July 2, 2024, CANDELARIO, PINA MENDEZ, and GARCIA AGUIAR were charged by Criminal Complaint in the District of Massachusetts with conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846.[1]  *See* 24-MJ-6479-MPK. Arrest warrants for CANDELARIO, PINA MENDEZ, and GARCIA AGUIAR issued on the same day.

---

[1] BERROA MERCEDES was arrested on a federal drug charge on May 4, 2024, and was indicted on federal drug charges in violation of Title 21, United States Code, Sections 846 and 841(a)(1) on May 30, 2024. *See* Crim. No. 24-10157-MJJ. On August 22, 2024, BERROA MERCEDES and CANDELARIO were indicted on a charge of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and CANDELARIO, PINA MENDEZ, and GARCIA AGUIAR were indicted on drug trafficking charges in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(A)(vi), 841(b)(1)(B)(i), and 841(b)(1)(B)(vi). *See* Crim. No. 24-10257-MJJ.

18. On July 9, 2024, investigators with the DEA went to 635 Main Street, Apartment 203, Wilmington, Massachusetts, to execute the arrest warrant for PINA MENDEZ. Investigators located PINA MENDEZ in the apartment, and he was taken into custody. Investigators seized two cellular telephones that were in bed with PINA MENDEZ at the time he was arrested.

19. That same day, agents obtained search warrants for Apartment 203 and for the two cellular telephones seized from PINA MENDEZ. From the living room of Apartment 203, agents seized a money counter, a suspected drug ledger, and $55,615 in bundled currency. From the kitchen of the apartment, agents seized a heat sealer, packages containing pressed white and grey powder that tested positive at the DEA Northeast Laboratory for fentanyl and xylazine (156 grams) and cocaine (138 grams), drug packaging material, a digital scale, and a box for a Glock handgun.[2] In the bedroom of the apartment not occupied by PINA MENDEZ, agents located documents in GARCIA AGUIAR's name, including his passport, compressed off-white powder in heat sealed packages that tested positive at the DEA Northeast Laboratory for cocaine and weighed 640 grams, and two cellular telephones.

20. Based on communications located on one of the cellular telephones located in bed with PINA MENDEZ at the time of his arrest, including messages and voice notes exchanged over the encrypted application Signal, I believe that on July 9, 2024, GARCIA AGUIAR was en route to Houston, Texas.

---

[2] Agents did not locate a handgun inside the apartment.

21. PINA MENDEZ was detained following his arrest. While in custody, he had recorded calls regarding his criminal activities. For example, two days after PINA MENDEZ's arrest, on July 11, 2024, PINA MENDEZ had a recorded video call with his mother from the Wyatt Detention Facility, where he was detained. PINA MENDEZ's mother called GARCIA AGUIAR on another telephone and placed her two telephones together on speaker so that PINA MENDEZ and GARCIA AGUIAR could speak with one another.[3] During the call, GARCIA AGUIAR told PINA MENDEZ that he had checked the "clothes" and that instead of twelve "pants," he had found only seven. PINA MENDEZ looked surprised and asked how that had happened. PINA MENDEZ further stated that that was impossible and said that they had twelve "pants" and that PINA MENDEZ had grabbed one of those pants. PINA MENDEZ told GARCIA AGUIAR that PINA MENDEZ had two "where [he] used to sleep," one that was "broken" and one that was "not good." GARCIA AGUIAR said that he understood, but that he needed to know exactly how many "pants" were there. PINA MENDEZ then said that there were eleven "pants" "size 36." GARCIA AGUIAR stated that that was what he had told "them," but that was why "they" wanted to call him (PINA MENDEZ). PINA MENDEZ stated that people often took advantage when "something happened." GARCIA AGUIAR then said that he had told "them" that PINA MENDEZ was on vacation.

---

[3] GARCIA AGUIAR was identified based on voice comparison with voice notes on telephones seized from 635 Main Street, Apartment 203 and on voice comparison with a subsequent jail call during which GARCIA AGUIAR briefly showed his face. PINA MENDEZ and GARCIA AGUIAR had communications over recorded lines at Wyatt Detention Facility in which they discussed drug trafficking in addition to those recounted herein.

22. Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, PINA MENDEZ and GARCIA AGUIAR discussed GARCIA AGUIAR's attempt to locate kilograms of drugs ("pants"). I believe that GARCIA AGUIAR had only been able to locate 7 kilograms of drugs, but that PINA MENDEZ believed that there should have been 12 kilograms of drugs. I believe that PINA MENDEZ stated that he had 2 kilograms of drugs at a location where he used to live, possibly 21 Forest Acres Drive, Apartment A, including one kilogram that was no longer in brick form ("broken") and one that was not good quality ("not good"). I believe that PINA MENDEZ further said that there were eleven kilograms at a price of $36,000 each ("size 36"). I believe that GARCIA AGUIAR stated that the suppliers of the kilograms wanted to speak with PINA MENDEZ; that PINA MENDEZ stated that people tried to take advantage of the situation when someone was arrested; and that GARCIA AGUIAR stated that the suppliers did not know that PINA MENDEZ had been arrested.

23. Similarly, on July 17, 2024, PINA MENDEZ and GARCIA AGUIAR had a recorded video call from the Wyatt Detention Facility, where PINA MENDEZ was being detained. During the call, GARCIA AGUIAR showed PINA MENDEZ a picture of Ezequiel Canela-Cabrera, who was arrested on July 13, 2024, in Vega, Texas, in possession of 100 kilograms of cocaine. GARCIA AGUIAR asked PINA MENDEZ if he recognized the picture, and PINA MENDEZ said, "Sure." GARCIA AGUIAR then said, "With 100 pesos." PINA MENDEZ looked surprised, said, "Damn, brother," and then asked if GARCIA AGUIAR's cousin had sent him the picture. GARCIA AGUIAR affirmed and proceeded to say that Canela-Cabrera had "changed things" and rented a car. GARCIA AGUIAR said, "You know how he used to do it with a thing," referring to transporting drugs with a hidden compartment, but had

9

changed methods and rented a car instead. GARCIA AGUIAR further stated that PINA MENDEZ's brother had told him that Canela-Cabrera was probably going to talk about the "store," referring to cooperate with law enforcement and provide information about the drug supplier. PINA MENDEZ agreed and said that Canela-Cabrera did not have "courage." GARCIA AGUIAR said that PINA MENDEZ's brother had said that they (GARCIA AGUIAR, PINA MENDEZ, and associates) needed to continue normally, because it wasn't their "problem," referring to continuing to conduct drug business as usual. PINA MENDEZ gave a two-thumbs-up gesture and said, "Of course." PINA MENDEZ then said, "That's what would have hurt me, I was thinking that it came from grandma's supermarket." GARCIA AGUIAR negated, saying, "No, no, that's their problem, that came from another store."

## SEIZURE OF THE SUBJECT TELEPHONES

24.    On August 5, 2024, agents arrested GARCIA AGUIAR in Boston, Massachusetts, on the arrest warrant issued on July 2, 2024. Subject Telephone #1 was recovered from GARCIA AGUIAR's person at the time of his arrest. At the time of his arrest, GARCIA AGUIAR was riding as the front seat passenger in a grey Nissan Versa driven by Ginelie Iraola. Iraola told investigators that Subject Telephone #2, which was charging in the car, belonged to GARCIA AGUIAR, and she gave Subject Telephone #2 to investigators.

## DRUG TRAFFICKERS' USE OF CELLULAR TELEPHONES

25.    Based on my training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include GPS technology for determining the location of the device.  Based on my training, experience, and research, I know that the Subject Telephones have some or all of the capabilities described above.  In my training and experience, examining data stored on devices of this type can show, among other things, evidence that reveals or suggests who possessed or used the device, as well as his criminal accomplices.

26.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

27.     Evidence of drug crimes often is found in cell phones and smart phones used by drug traffickers.  Such evidence can include internet searches, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in <u>Attachment B</u> on their cellular telephones.

28.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such numbers can confirm relationships among and between co-conspirators, as well as the occurrence of certain events.

29.     As with most electronic/digital technology items, communications made from an electronic device, such as a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.   Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a cell phone, used such a device.

30.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files

downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

31.     Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that evidence of drug trafficking activity will be found on the Subject Telephones.

## CONCLUSION

32.     Based on the foregoing, I believe there is probable cause to believe that the Subject Telephones presently contain the items set forth in Attachment B hereto, which is incorporated herein by reference, and that those items constitute evidence of the commission ofcriminal offenses, specifically, violations of Title 21, United States Code, Sections 846 and

841. Accordingly, I respectfully request the Court issue search warrants for the Subject Telephones.

    I declare that the foregoing is true and correct.

                                                  /s/ Ryan P. Glynn
                                                  _____
                                                  Ryan P. Glynn
                                                  Special Agent
                                                  Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Cr. P. 4.1 this 9th day of October, 2024.

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts

## ATTACHMENT A-1

Description of the Property To Be Searched

A grey iPhone 13 Pro Max seized from Yermis Garcia Aguiar, on August 5, 2024 (DEA Exhibit N-31), currently in the custody of the Drug Enforcement Administration, 15 New Sudbury Street, Boston, Massachusetts 02203.

**ATTACHMENT A-2**

Description of the Property To Be Searched

A white iPhone 8 seized from Yermis Garcia Aguiar, on August 5, 2024 (DEA Exhibit N-32), currently in the custody of the Drug Enforcement Administration, 15 New Sudbury Street, Boston, Massachusetts 02203.

**ATTACHMENT B**

<u>Items to be Seized from the Subject Telephone</u>

All records and data from January 1, 2023, to August 5, 2024, in any format whatsoever (digital, electronic, or otherwise) that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846 and 841 (drug conspiracy and drug distribution), including, without limitation:

a. Names and contact information that have been programmed into the device (including but not limited to contacts lists) of individuals engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device;

c. Text messages both sent to and received from the device (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e. GPS data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. All data within the device evidencing ownership, possession, custody, control, or use of the device; and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.